## No. 14-1746
_____

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT
_____

SD3, LLC and SAWSTOP, LLC,

*Plaintiffs-Appellants*,

*v.*

BLACK & DECKER (U.S.), INC., ET AL.,

*Defendants-Appellees*

_____

On Appeal from the United States District Court
for the Eastern District of Virginia,
Case No. 14-cv-00191-CMH-IDD
The Honorable Claude M. Hilton, United States District Judge
_____

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS
_____

CUNEO GILBERT & LADUCA, LLP
Jonathan W. Cuneo
Joel Davidow
Matthew E. Miller
507 C Street, NE
Washington, DC 20002
(202) 789-3960

*Counsel for Plaintiffs-Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  14-1746          Caption:  SD3, LLC et al. v. Black & Decker (US) Inc. et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

SD3, LLC
(name of party/amicus)

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                          ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                    ☐ YES ☑ NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Matthew M. Miller                    Date: _____8/1/2014_____

Counsel for: SD3, LLC and SawStop, LLC

## CERTIFICATE OF SERVICE
****************************

I certify that on _____8/1/2014_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

 See attached Service List.

/s/ Matthew E. Miller                              8/1/2014
          (signature)                                  (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No.  14-1746           Caption:  SD3, LLC et al. v. Black & Decker (US) Inc. et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

SawStop, LLC
(name of party/amicus)


who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO


2.      Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:


3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                ☐ YES ☑ NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Matthew M. Miller                            Date: _____8/1/2014_____

Counsel for: SD3, LLC and SawStop, LLC

## CERTIFICATE OF SERVICE
****************************

I certify that on _____8/1/2014_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

See attached Service List.

/s/ Matthew E. Miller                                              8/1/2014
(signature)                                                        (date)

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ........................................................ i

TABLE OF AUTHORITIES ....................................................................... viii

INTRODUCTION ........................................................................................ 1

JURISDICTIONAL STATEMENT .................................................................. 3

STATEMENT OF ISSUES FOR REVIEW ....................................................... 3

STATEMENT OF THE CASE ....................................................................... 4

   A.    Pertinent Facts ................................................................................. 4

       1.    Background ........................................................................ 4

       2     The AIMT Boycott ............................................................. 6

       3.    The Standards Conspiracies ................................................ 10

   B.    Pertinent Procedural History ............................................................ 12

SUMMARY OF THE ARGUMENT ............................................................... 13

STANDARD OF REVIEW .......................................................................... 15

ARGUMENT ............................................................................................. 16

   I.    PLAINTIFFS PLEADED AN ACTIONABLE BOYCOTT CLAIM IN
       COUNT I .................................................................................... 16

       A.    Plaintiffs Pleaded Sufficient "Factual Matter" to Suggest that An
          Agreement Was Made Not to License or Implement AIMT ............. 16

           1.    Plaintiffs' Allegations of Direct Evidence Made Any
                Examination of the Plausibility of the Circumstantial
                Allegations Unnecessary ............................................. 19

           2.    To the Extent Plaintiffs' Factual Allegations Are Construed as
                Allegations of Circumstantial (Rather than Direct) Evidence of
                an Agreement, Those Allegations Are More than Sufficient to
                Plausibly Suggest the Existence of an Agreement. .................. 22

v

a.   Plaintiffs Were Entitled to All Inferences That Could Reasonably Be Drawn in Their Favor from Mr. Peot's Testimony ....................................................27

    i.    Mr. Peot Offered Little, if Anything, on Friendly Cross-Examination to Refute His Own Testimony Earlier Provided on Hostile Direct Examination .29

    ii.   Drawing in Plaintiffs' Favor All Reasonable Inferences that Could Reasonably Be Drawn from Mr. Peot's Testimony, Plaintiffs Were Entitled to an Inference that Defendants Agreed to Respond Collectively to SawStop ........................................30

    iii.  Mr. Peot's Testimony on Cross-Examination, Which Was Not Adopted By Plaintiffs, Cannot Be Considered for the Truth of Matters Asserted Therein.................................................32

b.   Plaintiffs' Were Entitled to Have Accepted as True, and Were Entitled to all Reasonable Inferences that Could Be Drawn From, Their Well-Pleaded Allegations Concerning Licensing Negotiations ...............................34

3.   The Allegations of the FAC Support a Plausible Inference That There Was an Agreement Not to implement AIMT, Regardless of Whether They Also Support an Inference of an Agreement Not to License AIMT ................................................38

B.   Plaintiffs Were Not Required to Plead an Injury to Competition With Respect to Their Boycott Claim, But, in Any Event, Did So........................40

    1.   A Group Boycott by Horizontal Competitors is a *Per Se* Violation of the Sherman Act ...................................................40

    2.   Plaintiffs Pleaded Injuries to Competition in Both the Intellectual Property and Retail Table Saw Markets ...............42

II.  IN COUNTS II AND III, SAWSTOP PLEADED ACTIONABLE CLAIMS OF SUBVERSION AND CORRUPTION OF INDUSTRY STANDARD-SETTING PROCESSES................................................................46

A.  Plaintiffs Pleaded that Defendants Caused UL to Adopt Safety Standards That Did Not Enhance Safety, and Did So in Order to Injure Quality Competition and Innovation .........................................48

B.  Plaintiffs Adequately Alleged the Participation of All Defendants Against Whom Counts II and III Are Asserted...................................52

C.  Plaintiffs Adequately Alleged Injuries to Competition With Respect to Both Counts II and III ..........................................................................54

    1.  The Standard Setting Conduct Alleged Herein Constitutes *Per Se* Antitrust Violations for Which a Showing of Competitive Injury Is Not Required, But Which Nonetheless Was Pleaded 54

    2.  Plaintiffs Pleaded Injuries to Competition Resulting from Defendants' Standard Setting Conduct....................................55

        a.  STP 745's Refusal to Adopt an AIMT Requirement Has Stifled Quality Competition...............................................55

        b.  Plaintiffs Pleaded that STP 745's Adoption of an Arbitrary Blade Guard Standard Caused a Classic Injury to Competition by Preventing the Introduction of Alternative Product Designs ...........................................58

CONCLUSION....................................................................................................58

CERTIFICATE OF COMPLIANCE.........................................................................60

CERTIFICATE OF SERVICE.................................................................................61

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Phoenix Bond & Indem. Co.*, 149 F. Supp. 2d 989 (N.D. Ill. 2001) ..24

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988)...............56

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212 (4th Cir. 2004) 32

*Am. Inst. of Intradermal Cosmetics, Inc. v. Soc'y of Permanent Cosmetic Prof'l*, 2013 WL 1685558 (C.D. Cal. Apr. 16, 2013)............................ 47, 49, 55, 58

*Am. Society of Mechanical Engineers v. Hydrolevel Corporation*, 456 U.S. 556 (1982)................................................................... 47, 51

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012)........ 18, 31

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................. 18, 26

*Baker v. U.S.*, 21 F.2d 903 (4th Cir. 1927) ...............................................52

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)................................... passim

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358(3d Cir. 1992).........16

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) ...................................40

*CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150 (4th Cir. 2009).32

*Confre Cellars, Inc. v. Robinson*, 2002 WL 32376945 (D. Colo.  Mar. 6, 2002)...24

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962)....... 16, 38

*Deborah Heart and Lung Center v. Penn Presbyterian Medical Center*, 2012 WL 1390249 (D. N.J. April 19, 2012) ...............................................20

*Evergreen Partnering Grp. v. Pactiv Corp.*, 720 F.3d 33(1st Cir. 2013)......... 18, 23

*FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990)........................51

*Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669 (2d Cir. 1995) ...............................33

*Giarratano v. Johnson*, 521 F.3d 298 (4th Cir. 2008)...............................................15

*Golden Bridge Tech., Inc. v. Nokia, Inc.*, 416 F. Supp. 2d 525 ..............................47

*Gray v. Spillman*, 925 F.2d 90 (4th Cir. 1991) ........................................................31

*Guzell v. Hiller*, 223 F.3d 518 (7th Cir. 2000)..........................................................33

*In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538
    (M.D. Pa. 2009) .................................................................................................24

*In re Cotton Yarn Antitrust Litig.,* 505 F.3d 274 (4th Cir. 2007) ...........................52

*In re Flat Glass Antitrust Litig.*,  385 F.3d 350 (3d Cir. 2004) ...............................23

*In re Fosamax Prod. Liab. Litig.*, 707 F.3d 189 n. 4 (2d Cir. 2013) .......................30

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010) ...... 20, 21, 23, 26

*In re Text Messaging Antitrust Litig.*, 630 F.3d 622 (7th Cir. 2011)......................22

*In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738
    (N.D. Cal. May 9, 2011) ....................................................................................24

*In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214 (D. Kan. 2010) ...................24

*Interstate Circuit v. United States*, 306 U.S. 208 (1939)..........................................17

*Jones Knitting Corp. v. Morgan*, 361 F.2d 451 (3d Cir. 1966) ...............................40

*Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207 (1959) ..........................40

*Lease America Org. Inc. v. Rowe Intern. Corp.*, 2014 WL 1330928 (D. Mass.
    March 31, 2014)..................................................................................................20

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) ........................................32

*Lincoln Prop. Co. v. Roche*, 546 U.S. 81 (2005)......................................................33

*Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624 (3d Cir.1996) ...............................56

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. (1986).... 16, 26

*Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, 201 F.3d 436 (4th. Cir.
    1999) ..................................................................................................23

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. (1984)............................... 16, 26

*Northwest Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.*,
    472 U.S. 284 (1985)..........................................................................................41

*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998)........................................ 40, 55

*Osorio v. One World Techs. Inc.*, Case No. 06-cv-10725
    (D. Mass. Feb. 22, 2010 to March 4, 2010)......................................... 7, 8, 46

*Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379
    (4th Cir. 2014) ...................................................................................................18

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delawre Co., Inc.*,
    998 F.2d 1224 (3rd Cir. 1993).........................................................................23

*Precision Assocs., Inc. v. Panalpina World Transpt., (Holding) Ltd.*, 2013 WL
    6481195 (E.D.N.Y. Sept. 20, 2013) ............................................................24

*Primetime 24 Joint Venture v. Nat. Broad. Co.*, 219 F.3d 92 (2d Cir. 2000)..........56

*Radiant Burners, Inc., v. People's Gas Light & Coke Co.*, *364 U.S. 656*
    (1961)....................................................................................... 15, 46, 49

*Ray Commc'ns., Inc. v. Clear Channel Commc'ns., Inc.*, 673 F.3d 294
    (4th Cir. 2012) ...................................................................................................31

*Rebel Oil v. Atlantic Richfield Co.*, 51 F.3d 1421 (9th Cir.1995) ..........................56

*Robertson v. Sea Pines Real Estate Companies, Inc.*, 679 F. 3d 278
    (4th Cir. 2012) ...................................................................................... passim

x

*Sony Electronics, Inc. v. Soundview Techs.*, 157 F. Supp. 2d 180
(D. Conn. 2001) ........................................................................40

*Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406 (2d Cir. 2008) ................32

*Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010) ............... 17, 22, 31

*Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753 (7th Cir. 2013)...................................46

*Swanson v. Citibank, N.A.*, 614 F.3d 400 (7th Cir. 2010) (7th Cir. 2011) .............18

*U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390
(4th Cir. 2014) ........................................................................33

*U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*,
745 F.3d 131, 136 (4th Cir. 2014) ................................................26

*U.S. v. Abu-Maizar*, 940 F.2d 653, 1991 WL 153658 (4th Cir. 1991)...................52

*U.S. v. Auto. Mfrs. Ass'n*, 307 F. Supp. 617 (C.D. Cal. 1969) ...............................39

*U.S. v. Cardwell*, 433 F.3d 378 (4th Cir. 2005).......................................................52

*U.S. v. Foley*, 598 F.2d 1323 (4th Cir. 1979)................................................... 17, 38

*U.S. v. Nunez*, 673 F.3d 661 (7th Cir. 2012)...........................................................30

*United States v. Burgos*, 94 F.3d 849 (4th Cir. 1996) ..................................... 17, 38

*Veteran Constructors, Inc. v. Beeler Barney and Assocs. Masonry
Contractors, Inc.*, 2014 WL 4199238 (E.D.N.C. Aug. 22, 2014)................32

*West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010) 19, 20

*Wilson P. Abraham Constr. Corp. v. Tex. Indus., Inc.*, 604 F.2d 897 n.15
(5th Cir. 1979) ........................................................................52

**Statutes**

15 U.S.C. § 15 ........................................................................................3

15 U.S.C. § 26 ........................................................................................3

28 U.S.C. § 1291 ....................................................................................3

28 U.S.C. § 1331 ....................................................................................3

28 U.S.C. § 1367 ....................................................................................3

**Other Authorities**

Areeda, Antitrust Law 1503 (1986) .....................................................55

Roger D. Blair & Jeffrey L. Harrison, Antitrust Policy and Monopsony, 76 Cornell L. Rev. 297 (1991)...............................................................42

William C. Holmes, *1992 Antitrust Law Handbook* § 1.03[3]................23

**Rules**

Fed. R. Civ. P. 12(b)(6)................................................................. 13, 31

Fed. R. Evid. 201 ..................................................................................33

Fed. R. Evid. 201(a)..............................................................................32

# INTRODUCTION

This action addresses a conspiracy of the principal manufacturers of table saws sold in the United States to boycott a safety technology proven to greatly reduce serious table saw hand injuries. The Defendants' conduct substantially impaired competition and innovation in both the technology and retail table saw markets. It also resulted in countless unnecessary severe physical injuries. There are approximately 67,300 medically-treated injuries from table saw blade contacts yearly, approximately 8,000 of which result in amputations,[1] and most of which would not have occurred if not for Defendants' collusion against the implementation of the new safety technology.

Plaintiffs, the proprietors of this technology, sought relief under the antitrust laws, which were designed to protect competition. But what occurred and is occurring in the table saw industry looks nothing like the competition our antitrust laws aim to promote. Rather, principal table saw manufacturers agreed to "move forward" as an "industry" and "collectively" in response to a revolutionary safety technology because they were reluctant to pay royalties and concerned about the product liability implications of some, but not all, industry participants adopting safety technology. The table saw manufacturers rigged the market against

---

[1] FAC ¶¶ 52-53, A-82. *See also* Consumer Product Safety Commission, Table Saw Blade Contact Injuries; Advance Notice of Proposed Rulemaking; Request for Comments and Information (Sept. 14, 2011), http://www.cpsc.gov//PageFiles/90189/tablesaw.pdf.

Plaintiffs, to the detriment of consumers (1) by collectively refusing to license or implement Plaintiffs' technology, and (2) by causing industry organizations to retain outdated industry standards that legitimized inferior and less safe products and protected themselves from product liability claims. Defendants effectively suppressed a superior safety technology and prevented it from becoming available to most table saw consumers.

Plaintiffs, in the operative First Amended Complaint ("FAC"), plausibly allege the existence of illicit conspiracies. Their allegations are based in large part on direct evidence showing that an illegal boycott took place. And yet, the district court dismissed the action, determining that because Plaintiffs were unable to disprove a more benign rationale for Defendants' behavior they had failed to state a claim. But neither this Court, nor the Supreme Court, has ever suggested that a plaintiff need do so much at the pleading stage. A plaintiff need only plead enough facts to push its claim from possible to plausible and to suggest that discovery would reveal sufficient evidence. Plaintiffs surely have done this.

In dismissing the FAC, the district court also suggests that a boycott of intellectual property causes no cognizable injury if its inventor, years later, manufactures and sells a modest number of products. That reasoning is contrary to precedent establishing that boycotts of intellectual property are independently actionable.

2

Further, the district court determined, contrary to established precedent, that the dominant players in an industry cannot be held liable under the antitrust laws for implementing safety standards with no logical safety rationale, and that serve to repress technological innovation and competition.

Accordingly, the district court's judgment should be vacated.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over the action pursuant to Sections 4 and 16 of the Clayton Act of 1914 (the "Clayton Act"), 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§1331 and 1367.

On July 15, 2014, the district court granted certain defendants' motions to dismiss the operative First Amended Complaint ("FAC") pursuant to Fed. R. Civ. P. 12(b)(6).  A-180.

Plaintiff filed a Notice of Appeal on July 23, 2014.  A-181.  This Court therefore has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES FOR REVIEW

1.     Accepting as true the factual allegations in the FAC and affording Plaintiffs all inferences that could reasonably be drawn therefrom, did Plaintiffs assert sufficient factual matter to raise a reasonable expectation that discovery would reveal direct or circumstantial evidence of agreements not to license, or implement, active injury mitigation technology, as alleged in Count I?

2.    In alleging a horizontal boycott in Count I, were Plaintiffs required to allege an injury to competition, and, if so, were Plaintiffs' allegations of injuries to competition in the technology and retail saw markets, which the district court did not address, sufficient?

3.    Did Plaintiffs state actionable antitrust claims, in Counts II and III, by alleging that Defendants used their domination of a standard-setting committee in a consumer safety organization to subvert needed reforms and continue implementing standards that had no plausible safety rationale, which were designed to, and did, injure quality competition?

## STATEMENT OF THE CASE

### A.    Pertinent Facts

### 1.    Background

As of 1998, the U.S. Consumer Products Safety Commission ("CPSC") estimated that there were approximately 30,000 annual blade-contact injuries caused by table saws treated in emergency rooms.  FAC ¶ 49, A-81.  Nearly two decades later, it remains the case that "[t]ens of thousands of serious injuries occur every year as a result of contact with a table saw blade."  FAC ¶ 50, A-81.

Plaintiff SawStop, LLC ("SawStop") is, and has been at all times since its formation, in the business of developing safety technology for table saws.  Since

4

2004, SawStop has also manufactured and marketed its own relatively small line of table saws.  FAC ¶ 101, A-95.

Dr. Stephen F. Gass is the President of SawStop and a member of Plaintiff SD3, LLC ("SD3").[2]  Along with his co-inventors, Dr. Gass invented a type of active injury mitigation technology ("AIMT") for table saws and other power tools.  AIMT detects proximity or contact between an operator and a dangerous part of a power tool, such as a saw blade in a table saw, and then takes some action to mitigate injury to the operator.  FAC ¶ 59, A-83.[3]  In table saws, SawStop's AIMT (the "SawStop Technology") detects contact between a person and the blade and then stops and retracts the blade to mitigate injury.  FAC ¶ 60, A-83.  The SawStop Technology includes a safety system that detects accidental contact between a person and the spinning blade of the saw and then reacts to minimize any injury.  FAC ¶ 60, A-83.  Dr. Gass and SawStop have received many rewards and accolades, including honors from the CPSC, several major science and engineering publications, and trade organizations and publications.  FAC ¶ 63, A-84.

---

[2] SD3 owns SawStop, and is the holder of certain intellectual property rights associated with AIMT.  FAC ¶¶ 10, 62.  A-73, A-84.  SD3 and SawStop are collectively referred to herein as "Plaintiffs."

[3] A demonstration of the technology can be viewed at: http://www.youtube.com/watch?v=cTUOhYcw4ZY.

By 2000, Plaintiffs had successfully demonstrated their technology at trade shows and other events, and had begun discussions with various table saw manufacturers. Plaintiffs pursued a business model of licensing their technology to major manufacturers with the capacity to mass produce and market table saws incorporating it. FAC ¶ 65, A-86. Plaintiffs sought to license their technology at commercially reasonable rates, and were willing to do so at approximately 3% of wholesale prices. FAC ¶ 87, A-91.[4]

During the course of 2000 and 2001, Plaintiffs had meetings, and other communications, with representatives of several manufacturers, including Defendants Emerson Electric Co. ("Emerson"), B&D,[5] Bosch[6] and Ryobi, all of whom expressed interest in developing and marketing table saws with Plaintiffs' AIMT. FAC ¶¶ 67-77, A-86-88.

## 2.    The AIMT Boycott

In late 2000 and the beginning of 2001, all of the prospective licensing partners walked away from SawStop's AIMT, even though their evaluations of the technology (or at least those known to Plaintiffs) were positive. Ryobi, which

---

[4] A draft licensing agreement negotiated with Ryobi Technologies, Inc. ("Ryobi"), which represented the closest Plaintiffs came to consummating such an arrangement, provided for a 3% royalty, potentially escalating to 5% or 8% if saws with Plaintiffs' technology was successful in the marketplace. FAC ¶ 87, A-91.
[5] Black & Decker Corp. ("B&D Corp.") and Black & Decker (U.S.), Inc. ("B&D US") are collectively referred to in the FAC, and here, as "B&D."
[6] Robert Bosch Tool Corporation ("RBTC") and Robert Bosch GmbH ("RBG") are collectively referred to in the FAC, and here, as "Bosch."

came closest to consummating an agreement with Plaintiffs, suddenly stopped communicating with Plaintiffs when all that was needed was a few minor changes to an otherwise mutually acceptable licensing agreement. Likewise, Bosch and Emerson representatives cut off all licensing negotiations with Plaintiffs. FAC ¶¶ 75, 88, A-88, A-92. B&D made an offer it knew Plaintiffs could never accept: it offered a mere 1% royalty and demanded indemnification from Plaintiffs. FAC ¶ 89, A-92. The aborted Ryobi agreement, by comparison, provided for a 3% royalty (escalating if SawStop Technology captured market share). FAC ¶ 87, A-91.

For nearly a decade, Plaintiffs remained ignorant of Defendants' conspiracy. That changed in 2010, when David Peot, a former Ryobi engineer, revealed the conspiracy's existence during his testimony in a personal injury trial. *Osorio v. One World Techs. Inc.*, Case No. 06-cv-10725 (D. Mass. Feb. 22, 2010 to March 4, 2010).

Mr. Peot testified that he and representatives of other Defendants met separately during the annual Power Tool Institute ("PTI") meeting in October 2001. FAC ¶ 79, A-89. Mr. Peot wrote an email memorializing the meeting entitled "PTI Meeting and SawStop," which was sent to certain of his

7

colleagues within Ryobi and memorialized in meeting minutes.[7]  Neither of those

documents became part of the public record in the *Osorio* trial (or anywhere else).

At that meeting, Mr. Poet testified, Defendants determined that they should

engineer a collective plan of action in dealing with the SawStop AIMT.  FAC ¶ 80,

A-89.  They therefore considered "suggestions as to how *the industry, through PTI,*

*should move forward . . . on SawStop*."  Peot Testimony, at 110:3-8 (emphasis

added).  FAC ¶ 80, A-89-90.

> Q. Now, sir, on the second page -- you wrote this memo after a
> meeting, a PTI meeting, correct?
> A. I believe it was.
>
> …
>
> Q. Yes. And the subject of the memo is the PTI meeting, correct?
> A. That's correct.
> Q. Does that refresh your recollection that you wrote this immediately
> after a PTI meeting, sir?
> A. Yes.
> Q. And you're describing to them, that is, Mr. Dils, Mr. Bugos, and
> Mr. Pinkleton, what went on at this meeting in October of 2001,
> correct?
> A. That's correct.

---

[7]  *See* Testimony of David Peot ("Peot Testimony"), *Osorio v. One World Techs.*
*Inc.,* Case No. 06-cv-10725 (D. Mass. Feb. 25, 2010), at 128:9-131:1 (minutes
described by examining attorney and authenticated by Mr. Peot); 134:25-138:7
(oral argument on proposed introduction into evidence of the minutes themselves,
which was not permitted).  Plaintiffs expressly argued before the district court that
it was "probable that the minutes of PTI meetings" would "provide additional
direct evidence of the conspiracy." Plaintiffs' Memorandum in Opposition to
Defendants' Joint Motion to Dismiss Amended Complaint for Failure to State a
Claim Upon Which Relief Can Be Granted (Docket No. 190), at 5.

> Q. Okay. The first line of the memo, the 11:09 a.m. -- first page still, sir -- says, "As expected, this was a controversial topic at this year's meeting." Do you see that?
> A. Yes.
> Q. "And there was a lot of confusion with varying ideas and suggestions as to how the industry, through PTI, should move forward," right?
> A. Correct.
> Q. Should move forward on SawStop, correct, sir?
> A. Yes.

Peot Testimony, at 108:21-110:8.  FAC ¶ 80, A-89-90.

According to the summary of the meeting set forth in Mr. Peot's email and testimony, Defendants ultimately agreed that "a majority vote" would "decide the way the industry proceeds" with respect to SawStop.  Peot Testimony, at 113:4-114:3.  FAC ¶ 80, A-89-90.  On the stand, Mr. Peot admitted that concern about exposure to product liability suits was "one of the reasons" that Defendants "got together and decided that they would work collectively so that they would *all* put [SawStop Technology] on the market if and when they wanted to and decided that it was in their interests to do so."  Peot Testimony, at 125:11-14, A-138.

In substance, Mr. Peot's testimony suggests that Defendants agreed that no table saw manufacture would implement AIMT unless all of them did, in order to protect the entire industry from product liability actions.  It was also agreed that collective action would proceed only if all, or at least a substantial majority, of participants voted to participate.  FAC ¶ 80, A-89.

9

Unable to license its technology to existing manufacturers, SawStop, in 2002-2004, raised capital and began manufacturing and marketing its own specialized "cabinet saws," a product targeted toward a relatively small niche of the table saw market principally consisting of professional woodworkers.  FAC ¶¶ 101, 102, A-95-96.  Although SawStop subsequently introduced a slightly smaller saw in 2008, SawStop's sales accounted for less than 1% of table saws sold in the United States between 2004 and 2014.  No product with AIMT was available for the vast majority of table saw purchasers.  FAC ¶ 126, A-103.

### 3.    The Standards Conspiracies

On December 31, 2002, Dr. Gass submitted to Underwriters Laboratories, Inc. ("UL")[8] a written proposal to substantially modify UL's safety standards in light of the new SawStop Technology.  FAC ¶ 104, A-96.  The proposal would have required table saw manufacturers to implement some version of AIMT—be it SawStop's or a SawStop competitor's—to reduce the occurrence of severe table saw injuries.  UL referred the proposal to Standards Technical Panel 745 ("STP 745"), which determines the contents of UL 987, the safety standard for table saws.

---

[8] UL is a safety consulting and certification organization that issues voluntary safety standards applicable to many industries and products.  FAC ¶¶ 33-35, A-79.  While ostensibly voluntary, it is a practical necessity to obtain UL certification in order to sell power tools, and many other categories of products, through major retailers such as Home Depot or Lowe's, due to local laws, codes, and regulations.  *See* UL Background and Facts, http://ul.com/corporate/faq/general/background/.

But Defendants, who controlled STP 745, declined to evaluate the proposal on its merits. Instead, Defendants agreed to vote as a bloc (the "Standards Conspiracy") both (1) to thwart any proposal by any person to mandate the implementation of AIMT, and (2) to implement a design requirement for their own uniform blade guard design, as opposed to a performance-specific design, to prevent competition with respect to that feature. FAC ¶ 105, A-97.

STP 745 met on February 11, 2003, to consider the SawStop proposal to require AIMT. FAC ¶ 107, A-97. The proposal was rejected in accordance with Defendants' agreement. FAC ¶ 107, A-97. Thereafter, Defendants continued to prevent STP 745 from adopting an AIMT requirement, notwithstanding the technology's availability and proven effectiveness.

In 2007, UL 987 was revised to require a blade guard following a standardized design. FAC ¶ 115, A-99. The standards precluded the introduction of blade guards with other designs, regardless of how well they performed. FAC ¶ 111, A-98.

As of the commencement of this action, in February 2014, UL 987 still does not require any form of AIMT, notwithstanding the fact that the technology has existed for 15 years. And none of Defendants have obtained a license in any AIMT, nor have they, at least as of this date, brought to market any products with AIMT. FAC ¶ 127, A-103.

11

**B.     Pertinent Procedural History**

Plaintiffs commenced this action on February 20, 2014.  A-7, A-30.

Plaintiffs filed the operative FAC on April 24, 2014.  A-70.

Plaintiffs have brought three distinct claims under the Sherman Act, 15

U.S.C. § 1, and analogous state laws.

In Counts I and IV, Plaintiffs contend that Defendants engaged in a boycott,

consisting of an agreement not to license from SawStop, or implement, AIMT.

FAC ¶¶ 129-138; 163-172, A-104; A-107-108.

In Counts II and V, Plaintiffs contend that Defendants engaged in a

conspiracy to corrupt industry standards by preventing STP 745 from adopting a

performance standard requiring the implementation of AIMT, notwithstanding the

fact that at least one version of AIMT has been available for at least fourteen years.

FAC ¶¶ 139-150; 173-184, A-105-106; A-108-109.

In Counts III and VI, Plaintiffs contend that Defendants engaged in a

conspiracy to corrupt industry standards by causing STP 745 to adopt a standard

mandating a specific blade guard design, and precluding the sale of table saws with

competing blade guard designs.  FAC ¶¶ 151-162; 185-196, A-106-107; A-109-

110.

12

Named as defendants (the "Defendants") are those manufacturers, and certain of their affiliates, who participated in the foregoing conspiracies and/or are otherwise liable for the conduct of affiliated persons.

Defendants filed nine separate motions to dismiss. Defendants contended that Plaintiffs had failed to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).[9]

On July 15, 2014, the district court issued an order dismissing all claims asserted in the FAC for failure to state a claim upon which relief can be granted. A-180. The order was accompanied by a separate Memorandum Opinion (the "Opinion") (Docket No. 259). A-163.

On July 23, 2014, Plaintiffs filed their Notice of Appeal of the district court's order of July 15, 2014 (Docket No. 260).[10] A-181.

## SUMMARY OF THE ARGUMENT

Plaintiffs have adequately pleaded a claim that Defendants boycotted AIMT. Plaintiffs pleaded allegations of direct evidence, which, when construed in the light most favorable to Plaintiffs, suggest that discovery will reveal direct evidence

---

[9] Certain Defendants, which are business entities headquartered overseas, also contended that Plaintiffs failed to properly effect service and that the district court lacked personal jurisdiction over them. In its Opinion, the district court did not address jurisdictional and service issues raised by certain Defendants, nor limitations issues which were raised by certain of the moving Defendants.

[10] Plaintiffs also gave notice of an intention to appeal a discovery order entered by the district court on June 27, 2014 (Docket No. 253). A-181. Plaintiffs have since elected not to present that matter for appellate review at this time.

13

sufficient to prove Defendants' conspiracy. Alternatively, Plaintiffs pleaded

allegations of circumstantial evidence that go beyond mere parallel conduct,

sufficiently supporting a plausible inference of an illicit conspiracy. In finding that

Plaintiffs had not stated a claim, the district court ignored key factual allegations,

failed to draw all reasonable inferences from the facts in favor of Plaintiffs, faulted

Plaintiffs for failing to exclude other potential inferences that could be drawn from

the facts, and acted contrary to well-settled law holding that a party alleging a

conspiracy need not allege perfect lock-step parallel conduct. *See, infra*, at p. 19.

The district court also failed to consider that Plaintiffs alleged a conspiracy

not to *implement* AIMT, a claim that could be sustained independently of a claim

of a conspiracy not to *license* AIMT. *See, infra*, at p. 34.

The group boycott by horizontal competitors, alleged in Count I, was a *per

se* violation of the Sherman Act, for which a showing of market injury was

unnecessary Plaintiffs nonetheless alleged the existence, and injury to, an

intellectual property market distinct from the retail saw market (which Plaintiffs

had not even entered when the boycott began). Plaintiffs also alleged injuries to

competition in the table saw market that were not addressed by the district court.

*See, infra*, at p. 42.

With respect to both Counts II and III, Plaintiffs sufficiently alleged

corruption of standard setting processes by alleging in some detail that the

standards adopted by Defendants had no plausible safety rationale, which is more than enough under *Radiant Burners, Inc., v. People's Gas Light & Coke Co.*, 364 U.S. 656 (1961) and its progeny. *See, infra*, at p. 47.

With respect to Count II, Plaintiffs' alleged a market injury – an injury to product quality in the marketplace, which has been recognized by the Supreme Court and many lower courts as a cognizable injury to competition. *See*, *infra*, at p. 54.

With respect to Count III, Plaintiffs also alleged a market injury – that Plaintiffs and others were precluded from introducing to the marketplace table saws with alternative and/or superior blade guard designs. *See*, *infra*, at p. 58.

## STANDARD OF REVIEW

The Court is to review *de novo* the district court's grant of a motion to dismiss under 12(b)(6) for failure to state a claim, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

# ARGUMENT

## I. PLAINTIFFS PLEADED AN ACTIONABLE BOYCOTT CLAIM IN COUNT I

### A. Plaintiffs Pleaded Sufficient "Factual Matter" to Suggest that An Agreement Was Made Not to License or Implement AIMT

In order to prove a conspiracy to violate the antitrust laws, "the antitrust plaintiff should present direct *or circumstantial* evidence that reasonably tends to prove that the [defendant] and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (emphasis added). The evidence presented by the plaintiff must make it more likely than not true that defendants violated the antitrust laws, both when defending a motion for summary judgment, *see, e.g.*, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597-98 (1986), or during a trial, *see*, *e.g.*, *Monsanto*, 465 U.S. at 768. But "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). "[T]he character and effect of conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Id.*[11] And,

---

[11] *See also Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1365 (3d Cir. 1992) (district court "inappropriately compartmentalized" plaintiffs' evidence of a conspiracy).

16

even at a criminal trial, the evidence need not establish that the Defendants acted in

perfect lock-step; "while many conspiracies are executed with precision, the fact

that a conspiracy is loosely-knit, haphazard, or ill-conceived does not render it any

less a conspiracy-or any less unlawful." *United States v. Burgos*, 94 F.3d 849, 858

(4th Cir. 1996).[12]

　　　At the pleading stage, a plaintiff has a different, and more modest, burden;

she must allege "enough factual matter (taken as true) to suggest that an agreement

was made." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) Thus, there

are two noteworthy differences between a plaintiff's burden at the pleading stage

and at summary judgment.  First, a plaintiff need not submit evidence; rather, she

need only *allege* the existence of evidence which she will later use to demonstrate

that conspiracy.  *See id.* (a complaint must "raise a reasonable expectation that

---

[12] *See also Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939) ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators . . . Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy " (internal citations omitted)).  Consider *U.S. v. Foley*, 598 F.2d 1323 (4th Cir. 1979).  While testimony conflicted about who said what at a meeting of defendants at the outset of the conspiracy, the facts that some defendants who did not immediately raise their commission rates to the conspiracy rate were reminded by other defendants of their agreement and that all defendants raised most of their commission rates to the conspiracy rate within a year of the meeting were sufficient evidence from which to infer the defendants' criminal liability.  *Id.* at 1332-35.

17

discovery will reveal evidence of illegal agreement").[13]   Second, a plaintiff need

not show that its allegations suggesting an agreement are more likely than not true

or that they rule out the possibility of independent action, but only that the

allegations are plausible.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("The

plausibility standard is not akin to a 'probability requirement,' but it asks for more

than a sheer possibility that a defendant has acted unlawfully.").  *See also Owens v.*

*Baltimore City State's Attorneys Office*, 767 F.3d 379, 403 (4th Cir. 2014) ("The

recitation of facts need not be particularly detailed, and the chance of success need

not be particularly high."); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir.

2010) (7th Cir. 2011) ( "[T]he court will ask itself *could* these things have

happened, not *did* they happen.  For cases governed only by Rule 8, it is not

necessary to stack up inferences side by side and allow the case to go forward only

if the plaintiff's inferences seem more compelling than the opposing inferences.").

In other words, the factual allegations, even when assumed true, need not

demonstrate a probability that an antitrust violation occurred.  *See Evergreen*

*Partnering Grp. v. Pactiv Corp.*, 720 F.3d 33, 43 (1st Cir. 2013) ("[A]t the

pleadings stage, we need not concern ourselves with the evidentiary sufficiency of

---

[13] Thus, even after *Twombly*, there is no expectation, at this stage, that a plaintiff
set forth every detail concerning the allegations of a conspiracy.  *Starr v. Sony*
*BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010) (rejecting the contention that
*Twombly* requires a plaintiff to identify specifically the time, place, or person
related to each allegation of conspiracy).

Evergreen's antitrust claims on the merits.").  Moreover, in considering the

sufficiency of the allegations, the court may not choose between two plausible

inferences that may both be drawn from the factual allegations, even if it finds one

of the two interpretations more plausible.  *See Anderson News, L.L.C. v. Am.*

*Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) ("Because plausibility is a standard

lower than probability, a given set of actions may well be subject to diverging

interpretations, each of which is plausible.").

In the antitrust context, the *Twombly* requirements can be satisfied by

"alleging direct or circumstantial evidence, or a combination of the two."  *West*

*Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010).  *See*

*also Robertson v. Sea Pines Real Estate Cos., Inc.*, 679 F.3d 278, 289 (4th Cir.

2012) (same).

### 1.    Plaintiffs' Allegations of Direct Evidence Made Any Examination of the Plausibility of the Circumstantial Allegations Unnecessary

The *Twombly* requirements are satisfied when allegations of direct evidence

are offered – *i.e.*, when the allegation of a conspiracy is "supported by alleged facts

about the substance of their agreement." *Robertson*, 679 F.3d at 288.  In

*Robertson*, allegations describing an agreement's participants, terms, and purpose

were sufficient to describe an agreement alleged to violate the antitrust laws, even

though no specifics were provided as to times, locations of, or discussions at,

19

alleged meetings. *Id.* at 288-89. But a Plaintiff is never required to plead "evidence" *per se*. Rather, "if a plaintiff expects to rely exclusively on direct evidence of conspiracy, its complaint must plead 'enough fact to raise a reasonable expectation that discovery will reveal' this direct evidence." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 (3d Cir. 2010) (quoting *Twombly*, 550 U.S. at 556).

When sufficient allegations of direct evidence concerning the alleged agreement are pleaded, allegations of "circumstantial evidence sufficient to suggest a preceding agreement" are simply "superfluous," and "*Twombly*'s requirements with respect to allegations of illegal parallel conduct are inapplicable." *Robertson*, 679 F.3d at 289-90. *West Penn Allegheny Health Sys.*, 627 F.3d at 100 ("If a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question whether an agreement has been adequately pled."). Allegations of direct evidence might describe the existence of an express contract, *Robertson*, 679 F.3d at 289, or, perhaps a recording of an express agreement. *Ins. Brokerage*, 618 F.3d at 324 n. 23. *Accord Deborah Heart and Lung Center v. Penn Presbyterian Medical Center*, 2012 WL 1390249, at *3 (D. N.J. April 19, 2012) (direct evidence alleged where plaintiff alleged the existence of, but did not actually have a copy of, an express written agreement). *Cf. West Penn*, 627 F.3d 85, 100 (direct evidence alleged representatives of two

20

defendant health insurers made unsworn statements that they took actions harmful to the plaintiff physician group as a result of "negotiations" and an unspecified "agreement" with purported competitors); *Lease America Org. Inc. v. Rowe Intern. Corp.*, 2014 WL 1330928, at *3 (D. Mass. March 31, 2014) (direct evidence alleged allegations included that a specific meeting was convened to discuss how to respond to competitive threat posed by the plaintiff).

Here, the FAC provides allegations of direct evidence of a conspiracy. Mr. Peot, an engineer formerly employed by Ryobi, testified that he and representatives of other Defendants met in order to discuss the implementation of AIMT in their products. FAC ¶¶ 3, 78-82, A-71; A-89-90. Mr. Peot's email, according to his own testimony, indicated that "a majority vote" would "decide the way the industry proceeds." Peot Testimony, at 113:4-114:8. FAC ¶ 87, A-54. And Mr. Peot admitted under other that Defendants made an "agreement" "that all the companies would vote collectively as to how to respond to SawStop." Peot Testimony, at 113:4-114:8. FAC ¶ 87, A-54. Even if the Court were to find that Mr. Peot's trial testimony, in and of itself, falls short of a creating a jury question about whether an illicit conspiracy took place between Defendants, it provides more than "enough fact to raise a reasonable expectation that discovery will reveal" direct evidence. *Ins. Brokerage*, 618 F.3d at 319, 324 (quoting *Twombly*, 550 U.S. at 556). The evidence might take the form of the email in which Mr. Peot

21

memorialized the meeting. That email, titled "PTI Meeting and SawStop," was described to some extent by the examining attorney during the course of those portions of his testimony cited in the FAC. Peot Testimony, at 108:21-111:1. FAC ¶ 80, A-89. Other portions of the email may shed further light on what was discussed. The direct evidence might take the form of minutes of the meeting, which indisputably exist.[14] It is, thus, certainly "reasonable" to expect that such evidence can be procured through discovery. *See Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 329 (2d Cir. 2010) (Newman, J., concurring) (even where allegations of a conspiracy would "not suffice to take an antitrust plaintiff to the jury, it will sometimes suffice to overcome a motion to dismiss and permit some discovery").

> **2.      To the Extent Plaintiffs' Factual Allegations Are Construed as Allegations of Circumstantial (Rather than Direct) Evidence of an Agreement, Those Allegations Are More than Sufficient to Plausibly Suggest the Existence of an Agreement.**

A complaint can also satisfy Rule 8(a) in the antitrust context by setting forth allegations suggesting circumstantial evidence of a conspiracy. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2011) ("Direct evidence of conspiracy is not a sine qua non . . . . Circumstantial evidence can establish an antitrust conspiracy."). While "an allegation of parallel conduct and a bare

---

[14] *See* Note 7, *supra*.

assertion of conspiracy will not suffice" on its own to survive a motion to dismiss, *Robertson*, 679 F.3d at 289 (quoting *Twombly*, 550 U.S. at 556), an antitrust claim survives where it places "allegations of parallel conduct" into "a context that raises a suggestion of a preceding agreement." *Robertson*, 679 F.3d at 289 (citing *Twombly*, 550 U.S. at 557).

Well pleaded allegations of actual of meetings or communications among defendants, during which they had an *opportunity* to conspire, has long been held to be the type of "plus factor"[15] needed to turn mere parallel conduct into an actionable claim. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1242 (3rd Cir. 1993) (plus factors include, "'[f]or example, have they attended meetings or conducted discussions at which they had the opportunity to conspire . . .'") (quoting William C. Holmes, *1992 Antitrust Law Handbook* § 1.03[3], at 154). *See also Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, 201 F.3d 436, at *9 (4th. Cir. 1999) (unpublished) ("plus factors" include "opportunity to conspire" and "high level of inter-firm communications").

---

[15] Such "plus factors" are necessary to satisfy a plaintiff's summary judgment burden when relying on circumstantial evidence. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 359-60 (3d Cir. 2004). The Third Circuit has suggested that "plus factors" are the equivalent of the "something more" necessary at the pleading stage under *Twombly* when pleading a conspiracy based on allegations of circumstantial evidence. *Ins. Brokerage*, 681 F.3d at 321-22. *But see Evergreen Partnering Grp.*, 720 F.3d at 46 (holding that pleading plus factors is *not* required to satisfy the pleading requirements of *Twombly*, although "this is not to say that a § 1 conspiracy may not be made more plausible by bolstering factual allegations of parallel conduct with appropriate 'plus factors.'").

And when, as here, the Plaintiff provides at least some details concerning the timing and participants of specific meetings between competitors, such allegations are sufficient to satisfy the requirement of pleading something more than mere parallel behavior. *Precision Assocs., Inc. v. Panalpina World Transpt., (Holding) Ltd.*, 2013 WL 6481195, at *34 (E.D.N.Y. Sept. 20, 2013) (complaint that provid[es] specific dates, locations of meetings, and the names of participants and the defendants who they represented" does "more than allege 'conscious parallelism . . . '"); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738, at *28 (N.D. Cal. May 9, 2011) (complaint describing specific emails among alleged conspirators); *In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1233,1236 (D. Kan. 2010) (where plaintiffs alleged "meetings and communications involving specific participants and specific locations," but not the content of those discussions, which were purposefully concealed, the allegations are sufficient under *Twombly*); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 555 (M.D. Pa. 2009) (parallel action preceded by specific communications concerning product pricing); *Alexander v. Phoenix Bond & Indem. Co.*, 149 F. Supp. 2d 989, 1002 (N.D. Ill. 2001) (specific strategically-timed meeting among defendants "qualifies as a plus factor" even though plaintiff could not specifically plead what was discussed at the meeting); *Confre Cellars, Inc. v. Robinson*, 2002 WL 32376945, at *15 (D. Colo. Mar. 6, 2002) (pleading

24

requirements met by allegation that "individual defendants attended meetings on specified dates to discuss specifically what could be done about" a venture that gave the plaintiff a competitive advantage, and noting that "Plaintiff is not required to allege exactly what each defendant said during the meetings").

The FAC went far beyond what *Twombly* requires, describing a specific meeting, its setting, and identifying the entities represented and the individuals who attended on their behalf.  These discussions provide the critical "context" that "suggests" an agreement.  *Robertson*, 679 F.3d at 289.  Indeed, the existence of the meeting in question is not merely an "allegation."  It is an established fact admitted by several of Defendants in their answers.[16]

Plaintiffs have also alleged what was discussed at the meeting (how to respond collectively to the financial or legal threat presented by SawStop's innovation and that it would be better for Defendants to respond as an industry and either "all" adopt AIMT or "none" adopt it) and express discussions between competitors of their motive for partaking in a boycott (concern about the product liability implications of AIMT).  This, too, adds considerably to Plaintiffs' allegations of parallel conduct.  Accordingly, even if the Court were not to deem the allegations as "allegations of direct evidence" of an agreement, the allegations

---

[16] *See, e.g.*,  Hitachi Koki USA Ltd. Answer (Docket No. 210), p. 25 (admitting Hitachi USA was a member of PTI in October 2001 and Hitachi USA's representative attended one day of the annual PTI meeting).

are more than sufficient as circumstantial indicia of a "context" that "suggests" an agreement, which is all that *Twombly* requires.

In holding that Plaintiffs failed to state a claim, the district court applied a standard resembling a summary judgment standard, under which the plaintiff is required to demonstrate that the existence of a conspiracy is more likely than alternative inferences that could be drawn from the facts. *See* Opinion, p. 7, A-169 ("A conspiracy must be alleged by either direct or circumstantial evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently'") (*quoting Matsushita*, 475 U.S. at 588 (*quoting Monsanto*, 465 U.S. at 764))); Opinion, p. 12, A-174 ("Plaintiffs' pleading thus fails to explain why" an inference should not be drawn that Defendants' conduct was "simply the natural, unilateral reaction" to Plaintiffs' technology).  But a party alleging a conspiracy *in a pleading* need not provide evidence at all – conspiracies are *proven* with evidence, but are pleaded by the allegation of "factual matter," *Twombly¸* 550 U.S. at 556, or "allegations of" direct or circumstantial evidence.  *Ins. Brokerage*, 618 F.3d at 323-24.  More importantly, the factual allegations need not "tend to exclude the possibility of independent action."  That requirement exists only at the summary judgment and trial stages.  Here, the district court failed, as described below, to "take all of the factual allegations in the complaint as true," *Iqbal*, 556 U.S. at 678, or to "draw all reasonable inferences in [Plaintiffs'] favor." *U.S. ex rel.*

26

*Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th

Cir. 2014) (internal quotation marks and citations omitted).

> **a.    Plaintiffs Were Entitled to All Inferences That Could Reasonably Be Drawn in Their Favor from Mr. Peot's Testimony**

Mr. Peot, who spent his career employed by (or consulting with) major

power tool manufacturers, was a witness who was, in most respects, hostile to the

personal injury plaintiff in the *Osorio* action.  Nonetheless, on direct examination,

plaintiff's counsel was able to elicit testimony that was both quite helpful to the

personal injury plaintiff (who prevailed on product liability claims), and also

highly probative of the existence of a conspiracy to respond as a bloc to, and

suppress AIMT in violation the antitrust laws.  On direct examination, as noted

above, Mr. Peot testified that (1) meeting participants discussed "suggestions as to

how *the industry, through PTI, should move forward . . . [on SawStop]*," Peot

Testimony, at 110:3 to 110:8, (2) "the agreement was that all the companies would

vote collectively as to how to respond to SawStop," Peot Testimony, at 113:25 to

114:3, and (3) product liability was "one of the reasons" that Defendants "got

together and decided that they would work collectively so that they would *all* put

[AIMT] on the market if and when they wanted to and decided that it was in their

interests to do so."  Peot Testimony, at 125:11 to 125:14, A-138 (emphasis added).

27

On cross-examination, defense counsel attempted to "rehabilitate" Mr. Peot in an attempt to rebut the damaging testimony that his witness provided on direct examination. Mr. Peot's testimony on cross-examination was not referred to, much less incorporated in, the FAC. But, in motion practice before the district court in this matter, defense counsel cited to the latter testimony which they believe contradicted Plaintiffs' allegations of a conspiracy to violate the antitrust laws. This argument was accepted as true, and relied upon, by the district court.

Plaintiffs do not dispute that Mr. Peot's testimony was integral to the FAC, and that the district court could properly take judicial notice of the *contents* of the entire transcript. The problem is in *how* Defendants, and the district court, construed the testimony. The district court held that it could afford no relevance to Peot's direct examination, cited by Plaintiffs in the FAC, because "the full testimony reveals" that Mr. Peot, personally, "disput[ed]" what he had said on direct examination. *See* Opinion, p. 11, A-173 ("The full testimony reveals Mr. Peot disputing the suggestion that the Defendants would not use the technology developed by Dr. Gass, and explaining that the joint venture's purpose was 'to use whatever technology we felt would best prevent table saw accidents. There were no limitations that [Mr. Peot] can remember one way or the other.'").

28

i.    **Mr. Peot Offered Little, if Anything, on Friendly Cross-Examination to Refute His Own Testimony Earlier Provided on Hostile Direct Examination**

Mr. Peot's testimony on cross-examination simply does not contradict his testimony on direct examination. All he stated, in the testimony relied upon by the district court, was that he did not "remember" that there were "any limitations" on technologies that the blade contact joint venture (which was not formed until 2003) could utilize. Opinion, p. 11, A-173. Peot Testimony 146:5-12, A-138.

First, a statement from a witness that he does not remember something is hardly definitive as to any proposition.

Second, the existence, or lack of restrictions on a joint venture formed in 2003, is not dispositive as to what might have been agreed to at or around a meeting in October 2001.

Third, at least as construed by the district court, the witness was suggesting possible inferences from his testimony (and email described in that testimony). The district court stated, quite literally, that Mr. Peot was "disputing the suggestion" that Plaintiffs have asked the Court to draw from his e-mail and testimony. Opinion, p.11, A-173. In other words, a hostile witness stated that he would not draw the same inference from the evidence (including his own email, and testimony elicited on direct examination by a hostile examining attorney) that

29

a personal injury or antitrust plaintiff might, which is of no moment in the present action.

Fourth, the notion that there were no "limitations" (at least as far as Mr. Peot could "remember") on parties to an illegal contract is entirely consistent with an illicit agreement. The members of a boycott are *never* "limited" – they can leave the conspiracy anytime because "a criminal contract is unenforceable whatever form it takes." *U.S. v. Nunez*, 673 F.3d 661, 664 (7th Cir. 2012). And, even if they were not legally bound by their unenforceable criminal agreement, Defendants certainly acted as if they were. At Ryobi, for example, a group of engineers that was formed and ready to evaluate the technology never did anything, and never received authorization to go forward. FAC ¶ 86, A-91. And, as Plaintiffs have alleged (and Defendants cannot dispute), none of Defendants, individually or collectively, ever licensed AIMT from anyone, or (as of the date this action was commenced) implemented AIMT developed by anyone. FAC ¶ 127, A-103.

       ii.     **Drawing in Plaintiffs' Favor All Reasonable Inferences that Could Reasonably Be Drawn from Mr. Peot's Testimony, Plaintiffs Were Entitled to an Inference that Defendants Agreed to Respond Collectively to SawStop**

Even when a witness has offered contradictory testimony at different points of an examination, this does not somehow neutralize or eliminate any of the

witness' testimony. Indeed, as the Second Circuit has noted, this is so even at the summary judgment stage:

> In the ordinary case where a district court is asked to consider the contradictory deposition testimony of a fact witness . . . the general rule remains that a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury.

*In re Fosamax Prod. Liab. Litig.*, 707 F.3d 189, 194 n. 4 (2d Cir. 2013) (internal citations omitted). *Accord, e.g.*, *Ray Commc'ns., Inc. v. Clear Channel Commc'ns., Inc.*, 673 F.3d 294, 306 (4th Cir. 2012) (noting that "credibility determinations are not fodder for summary judgment proceedings") (*citing Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991)). If a court cannot disregard contradicted or contested testimony on summary judgment, it most certainly cannot on a motion to dismiss. *See Starr*, 592 F.3d at 329 (Newman, J., concurring).

The relevant inquiry is whether a plausible inference of a conspiracy could be drawn from those portions of Mr. Peot's testimony, and other factual allegations, relied upon by Plaintiffs. And it was at least as plausible as not that Mr. Peot testified truthfully in his direct examination, and prevaricated during cross-examination to protect his former colleagues and employer. Plaintiffs' reading is certainly plausible, even if Defendants suggest an alternative inference that might be drawn from Mr. Peot's partial recantations on cross-examination. It is irrelevant whether a contradictory inference could also be drawn from that

31

testimony, or other testimony properly before the court. *See Anderson News*, 680 F.3d at 185 (on a motion to dismiss, a court may not choose between two competing plausible inferences).

>        iii.    **Mr. Peot's Testimony on Cross-Examination, Which Was Not Adopted By Plaintiffs, Cannot Be Considered for the Truth of Matters Asserted Therein**

In considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a district court should limit itself to "the complaint itself and any documents that are attached to it," *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009), but may also consider a document attached by the defendant if such a document "was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).

Under Fed. R. Evid. 201(a), a court may take judicial notice *only* of facts that are (1) "generally known within the trial court's territorial jurisdiction" or (2) that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Accordingly, when considering an ancillary document that is "integral" to a pleading, a court may do so only for purposes of establishing the contents of that document (which can be readily determined and generally cannot be questioned), but *not* for the truth of any matters asserted in it. *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is

proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents."); *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (court may take judicial notice of court records, but "not for the truth of the facts recited therein"); *Veteran Constructors, Inc. v. Beeler Barney and Assocs. Masonry Contractors, Inc.*, 2014 WL 4199238, at  *3 (E.D.N.C. Aug. 22, 2014) (noting "distinction between taking judicial notice of documents filed in other courts and using judicial notice to bind a party to the truth of the matters asserted in the court filings," as "[t]he latter is not typically permitted").

A "civil plaintiff" is "the 'master of his complaint.'"  *U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 405-06 (4th Cir. 2014) (*quoting Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 91 (2005)).  Accordingly, even when an ancillary document is *attached as an exhibit* to a pleading, the district court is to accept as true only those portions of the document that the pleading party intends to adopt as true.  *See Guzell v. Hiller*, 223 F.3d 518, 519 (7th Cir. 2000) ("The plaintiff's purpose in attaching an exhibit to his complaint determines what assertions if any in the exhibit are facts that the plaintiff has incorporated into the complaint."); *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 675 (2d Cir. 1995) (district court erred in relying on the truth of matters asserted in a document authored by an adverse party that was appended to the complaint, when it was

33

offered by plaintiff "as a self-serving document rather than a particularization of their claim").[17]

Here, the district court plainly accepted as true Mr. Peot's testimony on cross-examination, in which he attempted to retreat from his earlier testimony on direct examination. That, in the district court's view, neutralized the testimony on direct examination cited in the FAC. By adopting as true certain portions of the testimony of a hostile witness, Plaintiffs did not somehow adopt as true the totality of his testimony or make it part of their complaint that must be accepted as true by the district court. The district court acted contrary to the well-settled rule that documents outside of the Complaint may only be used to establish their contents, and not the truth of the matters asserted therein.

> **b.    Plaintiffs' Were Entitled to Have Accepted as True, and Were Entitled to all Reasonable Inferences that Could Be Drawn From, Their Well-Pleaded Allegations Concerning Licensing Negotiations**

The district court did not acknowledge, much less accept as true, many of the factual allegations about Defendants' parallel conduct.

---

[17] *Twombly*, cited by the district court in support of the proposition that it could take judicial notice of the full text of Mr. Peot's testimony, is not to the contrary. The *Twombly* Court held only that that "the District Court was entitled to take notice *of the full contents* of the published articles referenced in the complaint," which is precisely what Plaintiffs, here, contend would similarly have been permissible. 550 U.S. at 568 n.13 (citing Fed. R. Evid. 201) (emphasis added). The *Twombly* Court clearly assumed that the district court had only reviewed the full text of the articles for purposes of determining their *contents*, and nothing more would have been permissible under Rule 201.

34

Plaintiffs' pleaded that "[a]t, or within a period of months" following the October 2001 meeting, Defendants met and agreed (1) not to license SawStop Technology (a type of AIMT), and (2) not to implement any type of Active Injury Mitigation Technology ("AIMT"). FAC ¶¶ 83, 130, A-90, A-104. The existence and implementation of this agreement are reflected in Mr. Peot's testimony, as well as in the cessation by Defendants of licensing negotiations with Plaintiffs, and refusal, over a period of fourteen years, to license from a developer, or introduce their own, any species of AIMT.

With respect to Defendant Ryobi, the district court, at the urging of Defendants, found that SawStop simply "refused to sign" a licensing agreement offered by Ryobi, ending their dealings. Opinion, p. 4, A-166. But what Plaintiffs actually pleaded was that SawStop asked Ryobi's in-house counsel for technical changes that would fix an ambiguity in the licensing agreement and that, although Ryobi promised to sign the revised agreement, a revised agreement never came.

> **FAC:** After SawStop advised Ryobi of a minor ambiguity in the January 18, 2002 licensing agreement, Ryobi's in-house counsel advised Plaintiffs that they should expect to receive a revised and corrected agreement, but that revised document never came. At the end of January 2002, Ryobi ceased responding to Plaintiffs about the SawStop Technology. FAC ¶ 87, A-91.

> **Defendants' Motion Papers:** Ryobi signed a "non exclusive" license agreement and sent it to Plaintiffs in January 2002, but it was Dr. Gass who refused to sign because of what he describes were "minor' issues." Memorandum of Points and

Authorities In Support of Joint Motion to Dismiss Pursuant to
Rule 12(b)(6) (Docket No. 166) ("Joint Memorandum"), at 4.

**Opinion:** Ryobi signed a "non-exclusive" license agreement
and sent it to Plaintiffs in January 2002, but Dr. Gass refused to
sign it because of what he described as "minor" issues.
Opinion, p. 4, A-166.

Plaintiffs further pleaded that, as testified to by Mr. Peot, Ryobi's in-house counsel

favored Ryobi's licensing the SawStop Technology "fast as they can" and that

Ryobi engineers remained enthusiastic about moving forward with SawStop

Technology and had formulated a timeline for assessing and developing it, but

were unaware who above them reneged on the first signature.  FAC ¶¶ 69, 86, A-

87, A-91.  Thus, two key contentions are overlooked in the Opinion: (1) that Ryobi

said it would sign but ultimately failed to sign a minimally revised licensing

agreement needed to cure two ambiguities, and (2) Ryobi avoided explaining why

it refused to sign a minimally revised licensing agreement.  Omitting these facts

creates the false impression that SawStop refused to license Ryobi.  The truth is

quite to the contrary, and quite suspicious – that Ryobi disappeared completely

when it was on the verge of consummating an agreement, and never provided an

explanation.  These allegations render highly plausible the inference that Ryobi

reneged because of an agreement with and/or pressure from the other conspirators

The district court stated that B&D's offer of an anemic 1% royalty somehow

disproved the conspiracy to refuse to deal.  Opinion, p. 9, A-171.  The district court

36

omitted, however, the pleaded and undisputed fact that B&D demanded indemnification from SawStop, which would have turned the license into a high risk deal for almost no revenue.  FAC ¶ 89, A-92.

The Opinion states that "Plaintiffs make no allegation that Emerson rescinded its offer." Opinion, p. 9, A-171.  But Plaintiffs pleaded that, in or around January 2002, "Emerson cut off all license negotiations with SawStop, offering pretextual reasons for its lack of interest."  FAC ¶ 88-89, A-92.

The district court also drew an inference in Defendants' favor that Bosch's ending of license negotiations shortly before the October 2001 PTI meeting showed that there was no conspiracy.  Opinion, p. 9-10, A-171-172.  But it is at least equally plausible that Bosch – whose representative chaired the meeting – organized the meeting to induce its rivals to follow its lead.  Peter Domeny, Bosch's representative, was the one who explained why uniform rejection of the licenses and the SawStop Technology safety feature was in the large table saw manufacturers' best interests.  FAC ¶ 80, A-89.

The district court concluded that Plaintiffs alleged merely the "failure of some Defendants to reach a licensing agreement with them."  Opinion, p. 12, A-174.  But Plaintiffs have not merely pleaded a "failure of some Defendants to reach a licensing agreement with them."  Plaintiffs pleaded a complete failure, over a 13-year period, by *any* of Defendants to license AIMT from *anyone*, or to implement

37

AIMT developed by *anyone* (including themselves),[18] notwithstanding the fact that one form of AIMT has existed since 1999, and could have saved tens of thousands of severed fingers if adopted on a large scale. The district court failed to afford Plaintiff all inferences that could be reasonably drawn from the allegations and not to weigh which inferences are *more* plausible. The district court further erred in (1) "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each," and failing to look at the conspiracy "as a whole," *Cont'l Ore Co.*, 370 U.S. at 699, and (2) acting contrary to binding precedent that participants in a conspiracy need not manifest their assent to an illegal agreement with any particular precision. *Burgos*, 94 F.3d at 858; *Foley*, 598 F.2d at 1332-35. These would be errors even at the summary judgment stage or at trial.

> **3.     The Allegations of the FAC Support a Plausible Inference That There Was an Agreement Not *to implement* AIMT, Regardless of Whether They Also Support an Inference of an Agreement Not *to License* AIMT**

Because Plaintiffs pleaded that Defendants' violated the antitrust laws both by agreeing to not implement and by agreeing not to license AIMT, even if the district court were *correct* in concluding that an inference could not be drawn from Plaintiffs' factual allegations that Defendants conspired not to license AIMT from SawStop, it would have no bearing on whether they had agreed to implement

---

[18]   FAC ¶¶ 90-91, 127, 130, A-92-93, A-103, A-104.

AIMT jointly or not at all. *See* FAC ¶¶ 80, 103, A-89, A-96 (alleging agreement to act uniformly to not implement AIMT).

It is entirely plausible that, even if some Defendants were considering entering licensing agreements with SawStop, Defendants uniformly intended not to implement AIMT or to actually pay any royalties. Such an agreement among manufacturers and their trade association has been the basis of conspiracy charges brought by the U.S. Department of Justice. *See U.S. v. Auto. Mfrs. Ass'n*, 307 F. Supp. 617 (C.D. Cal. 1969) (approving consent decree charging conspiracy between motor vehicle manufacturers to eliminate competition in the research, development, manufacture *and* installation of motor vehicle air pollution equipment, by agreeing that no firm would market the new clean technology until all firms were willing to).

One admission that Mr. Peot never attempted to retract on cross-examination was that a consensus was reached that PTI's table saw manufacturers would decide as a group whether or not *to implement* AIMT – *i.e.*, that all of them would do it, or none of them would . FAC ¶ 80, A-89. *See also* Peot Testimony, at 125:11 to 14, A-138 (Defendants "got together and decided that they would work collectively so that they would *all* put [SawStop Technology] on the market if and when they wanted to and decided that it was in their interests to do so").

39

Ever since that consensus was reached, none of table saw manufacturers have ever offered a saw with Plaintiffs' (or any comparable) technology. That agreement, even independently of an agreement not to license AIMT, would inevitably lead the industry not to pay royalties to plaintiffs, and Plaintiffs would be injured to the same extent. [19] *Cf. Blue Shield of Virginia v. McCready*, 457 U.S. 465, 479 (1982) (where injury to plaintiff is the highly likely result of a conspiracy, it does not matter that the conspiracy was aimed at a broader or slightly different objective).

**B.    Plaintiffs Were Not Required to Plead an Injury to Competition With Respect to Their Boycott Claim, But, in Any Event, Did So**

**1.    A Group Boycott by Horizontal Competitors is a *Per Se* Violation of the Sherman Act**

The Supreme Court has reaffirmed the rule that "group boycotts are illegal *per se*." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 130 (1998) (citing *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959)).  This rule applies in full force to a boycott of intellectual property by horizontally positioned potential licensees. *See, e.g.*, *Jones Knitting Corp. v. Morgan*, 361 F.2d 451, 459 (3d Cir. 1966) (agreement of knitting manufacturers not to negotiation with holder of a patent for a knitting fabric was *per se* illegal under the antitrust laws).  *See also Sony Electronics, Inc. v. Soundview Techs.*, 157 F. Supp. 2d 180, 188 (D. Conn.

---

[19] SawStop's injury would be a predictable byproduct of the illegal agreement, thus giving SawStop standing.

2001) (holding that *Jones Knitting* remains good law).  Accordingly, the Court

need not address whether Plaintiffs have pleaded an injury to competition as to

Count I.

The district court suggested that the *per se* rule is inapplicable where the

concerted action "is justified by 'enhanc[ing] overall efficiency and mak[ing]

markets more competitive.'"  Opinion, p. 12, A-174  (*quoting Nw. Wholesale*

*Stationers, Inc. v. Pac. Stationary & Printing Co.*, 472 U.S. 284, 293-95 (1985)).

*Northwest Stationers* holds that not all refusals to deal are boycotts that are *per se*

illegal, but was a summary judgment decision involving a purchasing cooperative,

a type of arrangement that, at least in some circumstances, could enhance

efficiency or make markets more competitive.  The *per se* rule was inappropriate in

that case.  *Nw. Wholesale Stationers*, 472 U.S. at 295 ("[N]ot every cooperative

activity involving a restraint or exclusion will share with the *per se* forbidden

boycotts the likelihood of predominantly anticompetitive consequences.").

The contrast between *Northwest Stationers* and the case at bar could not be

clearer.  That case involved a group with low market share, this one a dominant

group.  Here, Plaintiffs allege a classic boycott, in which Defendants are accused

precisely of "joint efforts" to "disadvantage" Plaintiffs by "persuading or coercing"

their peers to "deny relationships" that Plaintiffs needed "in the competitive

struggle."  *Id.* at 293-94.

**2.    Plaintiffs Pleaded Injuries to Competition in Both the Intellectual Property and Retail Table Saw Markets**

Assuming *arguendo* it was necessary to plead the existence of competitive injury, Plaintiffs have sufficiently done so.

First, Plaintiffs have pleaded a boycott in the intellectual property[20] market and an injury to competition in that market, but have never alleged a boycott in the retail table saw market.  FAC ¶¶ 83, 90-91, A-90-93.[21]  Plaintiffs' business model was to license their intellectual property to established manufacturers who had the existing manufacturing and marketing capacity to mass produce and market table

---

[20] That certain antitrust cases may be analyzed in terms of lessened competition in technology or product markets has been recognized for years, such as in the "Intellectual Property Guidelines" of the Department of Justice and Federal Trade Commission:

3.2.2 TECHNOLOGY MARKETS
Technology markets consist of the intellectual property that is licensed (the "licensed technology") and its close substitutes—that is, the technologies or goods that are close enough substitutes significantly to constrain the exercise of market power with respect to the intellectual property that is licensed.  When rights to intellectual property are marketed separately from the products in which they are used, the Agencies may rely on technology markets to analyze the competitive effects of a licensing arrangement.  U.S. Department of Justice and the Federal Trade Commission, *Antitrust Guidelines for the Licensing of Intellectual Property*, U.S. Dept. of Justice, 8 (April 6, 1995), http://www.justice.gov/atr/public/guidelines/0558.pdf.

In *Soundview Technologies*, the court noted that, if rewards to inventors are thwarted by monopsonistic cartels, "there may be social welfare consequences in the long run, because suppliers will leave the industry" or "will cease to innovate and invent."  157 F. Supp. 2d at 185 (citing Roger D. Blair & Jeffrey L. Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297 (1991)).

[21] Plaintiffs pleaded that, as of 2001,they were *not in the table saw business and had no intention of entering the table saw business*.  FAC ¶ 65, A-86.

42

saws incorporating Plaintiffs' AIMT. And the injury to competition in the intellectual property market was complete: all of the potential mass producers of table saws joined the boycott of AIMT, so there were no buyers for a willing seller. *See* FAC ¶¶ 90-91, A-92-93 (Plaintiffs alleged that Defendants injured the technology market by removing all rewards for innovation). Plaintiffs only went into the manufacturing business *because* of the boycott. FAC ¶ 101, A-95.

Second, Plaintiffs have alleged that the AIMT boycott injured competition in the retail table saw market by collectively denying most US consumers the choice to purchase a safer saw. FAC ¶¶ 90-91, A-92-93. Defendants here represent essentially all the firms that supply table saws to the American public. FAC ¶44, A-81 (PTI members accounted for approximately 85% of table saws sold in the United States from 1993 to 2003). They evolved a plan during late 2001 and early 2002 that none of them would offer American consumers a choice to forego cheap, dangerous saws (particularly table saw) for a higher cost, higher priced saw with AIMT. FAC ¶¶ 78-85, A-89-91. Defendants' agreement to deny consumers such choice was so successful that, even today, no American can walk into a major retail outlet and buy a safe saw. FAC ¶ 127, A-103. SawStop has never had the capacity to supply more than a nominal portion of the U.S. table saw annual demand, and makes only a limited (albeit expanding) number of models for a relatively small segment of the table saw market. The vast majority of retail table

saw purchasers continue to risk suffering serious injuries—and hundreds of thousands have been injured—because of Defendants' boycott of AIMT.  FAC ¶ 126, A-102.

The district court concluded that SawStop's introduction of its own table saws in 2004 precluded any possibility of an injury to competition.

The first problem with the district court's analysis is that it did not address Plaintiffs' allegations of competitive injury in the intellectual property market, which was the only market in which Plaintiffs were active participants at the time the boycott originated.

Second, in finding insufficient allegations of an injury to competition in the retail table saw market, the district court overlooked well-pleaded factual allegations in the FAC establishing that the Plaintiffs, particularly as of the early 2000s, lacked the capacity to make much impact on the market as a manufacturer. SawStop did not sell any saw of any kind of saw until 2004, three years after the boycott began.  SawStop's sales of 50,000 table saws *over 10 years* did not even constitute 1% of total industry sales of table saws in the United States of approximately 7,000,000 saws over that same time period.  *See* FAC ¶¶ 48, 91, A-81, A-93.  Plaintiffs alleged a substantial injury to quality competition in the retail saw market – an injury that was only mitigated slightly by the later introduction by Plaintiffs of a limited number of products in one market segment for table saws.

44

The district court also suggested that Defendants' subsequent failure to adopt AIMT rendered any conspiracy allegations implausible (because Defendants could not have had the motivation three years earlier to avoid potential liability exposure). Opinion, p. 12-13, A-174-175. But the fact that Defendants did not adopt AIMT after 2004 (when SawStop introduced its first retail product) in no way demonstrates that "Defendants' purported motivation for the alleged conspiracy is non-existent," Opinion, p. 13, A-175, nor that Plaintiffs' boycott allegations are less than plausible. At the time the boycott was commenced, the participants Defendants could not possibly have known if SawStop would ever enter the industry as a manufacturer.[22] Moreover, SawStop's later, and very modest, entrance into the market did not undermine Defendants' motivation for continuing the boycott: to protect themselves from liability. It would be reasonable for the larger table manufacturers to assume that juries in negligence cases would be more swayed by proof of the availability of such technology on a mass market, brand-name table saws than a product with a very small market share that was not even in production when Defendants agreed to boycott SawStop Technology.

In fact, many years after SawStop's entry into the cabinet saw segment of the market, the Defendants continue to argue, including before two Circuit Courts of Appeal, that the technology is unproven and not viable on the smaller saws that

---

[22] Indeed, the FAC specifically pleads that SawStop lacked capacity to mass produce or market finished saws. FAC at ¶ 91, A-93.

make up the vast majority of the table saw market. *Osorio v. One World Technologies, Inc.*, 659 F.3d 81, 84 (1st Cir. 2011) (although "Ryobi insists that [SawStop's] design falls short of being a viable alternative" for a benchtop saw, the plaintiff, who was awarded $1.5 million by the jury, presented more than sufficient proof on this point). *See also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 757-58, 764, 767 (7th Cir. 2013) (although "Ryobi contends Gass's terms were unreasonable and the technology was too expensive and unproven," the district court erred, *inter alia*, in not permitting plaintiff's economist to testify as to the social cost of *not* implementing the technology, estimated at $753 per table saw).

The fact Defendants *never* introduced a product with AIMT supports highly plausible inferences as to (1) Defendants' ongoing concern about the product liability implications of doing so, and (2) the continued existence and effectiveness of the boycott. It is a bit of a stretch, to say the least, that a contrary inference could also be drawn, but, even if it could, it is not the province of a district court on a motion to dismiss to weigh the plausibility of competing inferences.

## II.     IN COUNTS II AND III, SAWSTOP PLEADED ACTIONABLE CLAIMS OF SUBVERSION AND CORRUPTION OF INDUSTRY STANDARD-SETTING PROCESSES

In *Radiant Burners*, the Supreme Court held that an industry association's denial of approval to a product for anticompetitive reasons (rather than out of a

46

genuine safety concern), was actionable under the antitrust laws.  364 U.S. 656, 658-659.  In *American Society of Mechanical Engineers v. Hydrolevel Corp.*, the Supreme Court reaffirmed this principle, affirming the judgment against a standards organization and certain of its members arising from a plot to deny approval to plaintiff's newer, cheaper, and safer technology. 456 U.S. 556, 577 (1982).

Recent district court decisions have affirmed the vitality of these precedents. For example, in *American Institute of Intradermal Cosmetics, Inc. v. Society of Permanent Cosmetic* Professionals, the court sustained a claim that the members of the defendant group used supposed safety guidelines to stifle competition.  2013 WL 1685558, *1 (C.D. Cal. Apr. 16, 2013). *Accord Golden Bridge Tech., Inc. v. Nokia, Inc.*, 416 F. Supp. 2d 525, 532 (E.D. Tex. 2006) (plaintiff pleaded actionable *per se* claim that defendants corrupted industry standards).

SawStop Technology works (a fact that, in addition to actually being true, is required to be accepted as true for present purposes); when it detects contact between a person and a table saw blade SawStop Technology stops and retracts the blade to prevent serious injury.  FAC ¶ 60, A-83.  Defendants had observed and tested SawStop Technology and knew that it stopped table saw blades quickly FAC ¶ 70, A-87.  Defendants' employees were enthusiastic about its adoption.

47

*See, e.g.*, FAC ¶ 69, 71, A-87.  Nonetheless, Defendants banded together to

dominate the key UL committee and subvert safety standards for table saws.

**A.    Plaintiffs Pleaded that Defendants Caused UL to Adopt Safety Standards That Did Not Enhance Safety, and Did So in Order to Injure Quality Competition and Innovation**

With respect to the claim in Count II that Defendants caused STP 745 to

reject an AIMT requirement, Plaintiffs have alleged that "[r]equiring AIMT would

have been a more beneficial improvement, and would have done considerably

more to prevent serious injuries to table saw users, than those modifications

mandated by the 2005 and 2007 amendments to UL 987."  FAC ¶ 125, A-102.

This is because "changes to UL standards that require only new blade guards as

part of a table saw's design will not prevent most injuries resulting from a table

saw operator approaching the blade from the front, where most work pieces are fed

into the table saw."  FAC ¶ 125, A-102.  Plaintiffs have further pleaded that

Defendants were aware of the efficacy of AIMT, and there was no plausible safety

or technical purpose for preventing the adoption of an AIMT requirement.  FAC ¶

126, A-102.

With respect to the claim in Count III that Defendants intentionally caused

STP 745 to adopt an inferior design-specific guard standard, rather than a

performance-based standard, Plaintiffs have pleaded that Defendants have insisted

on their "preferred guard design, even though it has no performance advantage

48

over other designs." FAC ¶ 122, A-100. The standard is "more specific and design-focused (as opposed to a performance standard) than necessary." FAC ¶ 124, A-101. Plaintiffs have further pleaded that the main purpose of this initiative was to prevent product liability claimants from contending that a better guard design could have prevented their injuries. FAC ¶ 124, A-101. Plaintiffs have further pleaded that, "[i]f STP 745 had been motivated to implement the best performance standard, it would not have selected the standard that it chose." FAC ¶ 124, A-101.

The common element of both claims is that safety and technical merits were abandoned, or at the very least, subverted, to provide an unfair competitive advantage to the firms dominating the industry at the expense of customer safety. And that is all that is required, as a matter of law, under *Radiant Burners* and *Hydrolevel*. Plaintiffs offered to prove that the saw makers' arguments against AIMT, and in support of a uniform blade guard design, had no safety rationale. Plaintiffs should have been permitted to proceed with discovery to support those claims. *Cf. Intradermal Cosmetics,* 2013 WL 1685558, at *6. (sustaining claim, under *Radiant Burners*, based on allegations that the standards were "created by parties with an economic interest in the standards and because they are divorced from any meaningful, scientifically justified safety standard," that they ostensibly

49

were promulgated for safety purpose but had the "real purpose" of stifling

competition).

The district court's analysis of the substance of Plaintiffs' standard setting

allegations in Counts II and III is articulated in the following two sentences:

> Plaintiffs put forth no facts, however, alleging that Defendants'
> participation was either undisclosed or otherwise impermissible.  In
> fact, Plaintiffs acknowledge that standards participants need not
> consider public interests over their own interests when considering
> UL standard changes.

Opinion, p. 16, A-178.

But Plaintiffs set forth ample facts, summarized above, describing how

Defendants voted as a bloc and caused the UL to adopt standards for

anticompetitive reasons rather than product safety reasons.  These factual

allegations were not addressed in the Opinion.

And the notion that Plaintiffs "acknowledged that standards participants

need not consider public interests" is not true,[23] and is a misstatement of the law.

What Plaintiffs actually pleaded is quite different – namely, that "Members of STP

745 are not required *by the UL* to consider public interests over their own interests

when considering changes to UL Safety Standard 987."  FAC ¶ 36, A-80

---

[23] Certain of the moving Defendants argued that "Plaintiffs affirmatively allege
that standards participants 'are not required to consider public interests over their
own interests when considering changes to UL Safety Standard 987.'"  Joint
Memorandum (Docket No. 166), p. 23 citing FAC ¶36.  That is the essence of what
this Opinion holds.

50

(emphasis added).  The purpose of the allegation is to make it clear that the UL,

institutionally, gave Defendants free reign to act in their own commercial interests

on STP 745, and exercised no institutional control over the members of STP 745 –

a factual allegation intended to preclude any argument by Defendants that their

actions were ratified by the organization itself (even assuming that such ratification

might matter).[24]  But the notion that those who participate in setting safety

standards are somehow immune from liability under the antitrust laws if they are

pursuing their own pecuniary motives is simply wrong, and was dispensed with

decades ago by the Supreme Court.  It is "irrelevant" whether members of a

standard-setting body "act in part to benefit [the organization] or solely to benefit

themselves or their employers," because their conduct "can have the same

anticompetitive effects on the marketplace."  *Hydrolevel*, 456 U.S. at 573-74.

Actions taken with pecuniary motives by members of standard-setting

organizations are subject to *higher* antitrust scrutiny than those undertaken in

furtherance of the public interest.  *FTC v. Superior Court Trial Lawyers Ass'n*, 493

U.S. 411, 426-27 (1990) (boycott by bar organization analyzed under *per se* rule,

rather than rule of reason, when it was pursuing members' own "economic

---

[24] In *Hydrolevel*, the Supreme Court clarified that the *lack* of express ratification by
the standard-setting organization does not preclude the liability of the organization
for the conduct of its members under principles of apparent authority.  456 U.S. at
577.

advantage," as compared with boycotts by civil rights groups to advance sociopolitical objectives).

### B.    Plaintiffs Adequately Alleged the Participation of All Defendants Against Whom Counts II and III Are Asserted

It is well settled that "[a]ntitrust co-conspirators are jointly and severally liable for all damages caused by the conspiracy to which they were a party." *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 284 (4th Cir. 2007) (quoting *Wilson P. Abraham Constr. Corp. v. Tex. Indus., Inc.*, 604 F.2d 897, 904 n.15 (5th Cir. 1979)). In fact, a defendant is responsible for the acts of a conspiracy regardless of whether that defendant directly participates in any overt acts after joining the conspiracy. *U.S. v. Cardwell*, 433 F.3d 378, 391 (4th Cir. 2005). "By joining in the conspiracy," moreover, "each defendant became liable both for the acts of his co-conspirators done before he joined the conspiracy and the acts subsequent to his participation." *U.S. v. Abu-Maizar*, 940 F.2d 653, 1991 WL 153658, at *3 (4th Cir. 1991) (unpublished) (citing *Baker v. U.S.*, 21 F.2d 903, 905 (4th Cir. 1927)).

Plaintiffs have pleaded that all Defendants then participating in the industry joined the conspiracy upon its formation in or around February 2003 and that the group agreed to "vote as a bloc . . . (1) to thwart any proposal by any person to mandate the implementation of AIMT, and (2) to implement a design requirement for their own uniform guard design, as opposed to a performance-specific design, to prevent competition with respect to that feature." FAC ¶ 105, A-97. Plaintiffs

pleaded that the Standards Conspiracy committed at least six overt acts between its

formation and the commencement of this action.[25]

The district court suggested that liability for standard setting conduct alleged

in the Complaint could only be attributed to those Defendants represented on STP

745, and stated that "Plaintiffs allege that only Defendants Black & Decker,

Emerson, Makita, Bosch, and Ryobi had representatives on the relevant standards-

setting committee."  Opinion, p. 14, A-176.  But this is not accurate.  Milwaukee

Electric was also represented on STP 745 at the formation of the Standards

Conspiracy in 2003, as was Pentair, Inc. and its two (then) manufacturing

subsidiaries.  FAC ¶¶ 79, 106, A-89, A-97.  The only Defendants participating in

the industry at the time who were *not* represented on STP 745 directly or by an

affiliate were Hitachi Koki, USA and its parent (Defendant Hitachi Koki Co.,

Ltd.).

---

[25] These include (1) the 2003 rejection by STP 745 of a proposal to require AIMT, FAC ¶ 107, A-97; (2) the sixth revision of UL 987 in 2005, FAC ¶ 113, A-98; and (3) the seventh revision of UL 987 in 2007, FAC ¶ 115, A-99, (4) weekly conference calls for purposes of maintaining the Standards Conspiracy, FAC ¶ 121, A-100, (5) actively opposing the adoption of AIMT requirements in potential revisions of UL 987, through, among other things, their active conduct in a UL working group, and publishing false information about AIMT, FAC ¶ 123, A-101, and (6) advocating before the International Electrotechnical Commission for blade guard standards similar to those adopted by STP 745, and which are favorable to Defendants, but with no plausible performance advantage.  FAC ¶ 122, A-100.

The district court further stated that "there are no allegations that Hitachi Koki, Milwaukee Electric Tool, One World Technologies, or Techtronic Industries North America had any involvement other than being PTI members." Again, this is not accurate. Milwaukee Electric, which was a PTI member, was, as noted above, represented on STP 745 and participated directly in its conduct. Hitachi Koki was a PTI member, but OW Technologies and TINA are never alleged to be PTI members. But Hitachi Koki, OW Technologies and TINA (among other Defendants) entered into a joint venture agreement concerning blade guards, which is alleged to be an act of fraudulent concealment in furtherance of the Standards Conspiracy. FAC ¶ 111, A-98. Plaintiffs have thus sufficiently alleged that all named Defendants participated in overt acts or, at least, ratified those performed by others.

### C. Plaintiffs Adequately Alleged Injuries to Competition With Respect to Both Counts II and III

#### 1. The Standard Setting Conduct Alleged Herein Constitutes *Per Se* Antitrust Violations for Which a Showing of Competitive Injury Is Not Required, But Which Nonetheless Was Pleaded

Standard setting conduct has been and should be held to constitute a *per se* violation of the antitrust laws when it amounts to collusion between horizontal competitors designed to subvert legitimate purposes and instead inflict competitive harm upon a third party as well as injury to consumer choice. *See*

54

*NYNEX*, 525 U.S. at 135 ("*per se*" designation limited to "horizontal agreements among direct competitors" in the boycott context); 13 Herbert Hovenkamp, Antitrust Law ¶ 2232b, at 354 (1999) (standard setting conduct constitutes a *per se* violation when the standard adopted has no other purpose than to facilitate collusion or to exclude a superior product). In *Intradermal Cosmetics*, the court held that an allegation of abuse of an industry standard setting process, such as alleged in this action, pleads "a *per se* violation under Section 1 and analysis of the sufficiency of its 'rule of reason' allegations is therefore unnecessary." 2013 WL 1685558, at *8. Similarly, in *Golden Bridge*, the district court held that the standard setting allegations, if proven, would establish a *per se* violation of the Sherman Act. 416 F. Supp. 2d at 530. Here, too, the allegations of subversion of standard setting processes by direct horizontal competitors should be sufficient to state a *per se* violation.

> **2.      Plaintiffs Pleaded Injuries to Competition Resulting from Defendants' Standard Setting Conduct**

> > **a.     STP 745's Refusal to Adopt an AIMT Requirement Has Stifled Quality Competition**

Reducing output and raising prices are not the only injuries to competition that the antitrust laws are designed to prevent. The Supreme Court has long recognized that "eliminat[ion of] quality competition" is a cognizable injury to competition. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500

55

n.5 (1988) (quoting 7 P. Areeda, Antitrust Law 1503, at 373 (1986)).  So have

other circuit courts.  *See, e.g.*, *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219

F.3d 92, 103 (2d Cir. 2000) (plaintiff "clearly alleged injury" to competition in

pleading that competitors had, among other things, diminished the quality of

service to customers); *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir.

1996) (antitrust injuries "affect[ ] the price[ ], quantity *or quality* of goods or

services" ) (emphasis added); *Rebel Oil v. Atlantic Richfield Co.*, 51 F.3d 1421,

1433 (9th Cir. 1995) ("Consumer welfare is maximized when . . . consumers are

assured competitive price and quality ... an act is deemed anticompetitive . . . when

it harms both allocative efficiency and raises the prices of good above competitive

levels or diminishes their quality.").

Quality competition is a form of competition.  When an innovative

competitor changes the state of the art, industry standards should move with the

advancement of available technology.  Innovators should be able to reap whatever

rewards are warranted by that innovation, not face a standards-facilitated boycott

protecting entrenched companies at the expense of the public and the innovator.

Defendants' agreement not to license or sell table saws with AIMT prevented

STP 745 from adopting any AIMT standard, and succeeded in keeping safe saws

out of most segments of the table saw market for eight or more years (since

SawStop only had the production and distribution capacity, to produce table saws

56

in certain narrow market segments).  The result of all this is that millions of consumers were sold dangerous products and tens (if not hundreds) of thousands suffered grievous injuries that could have been prevented if the industry had allowed competition among all firms in terms of quality and safety.

Corrupting the standard setting process to protect inferior products has been profoundly anti-competitive, drastically reducing any incentive to compete on quality.  None of Defendants has, even years later—and notwithstanding the ten-year existence of a purported joint venture designed to do so—brought a product with AIMT to market.  FAC ¶¶ 127, A-103.  In the meantime, the quality of products available in most segments of the table saw marketplace has been left far behind the current state of the art, dramatically injuring both competition and hundreds of thousands of end users.

The district court concluded, apparently with respect to Count II, that, because the rejection of an AIMT requirement did not keep Plaintiffs from introducing at least one product to the marketplace, there could not have been any injury to competition.  Opinion, p. 15-16, A-177-178.  But the exclusion of a particular product is only one possible type of competitive injury.  The district court did not address Plaintiffs' allegations that the failure to adopt an AIMT requirement substantially impaired quality competition – specifically, competition to develop and implement safety features.

**b.** **Plaintiffs Pleaded that STP 745's Adoption of an Arbitrary Blade Guard Standard Caused a Classic Injury to Competition by Preventing the Introduction of Alternative Product Designs**

The blade guard standard, arbitrarily and with no technical or safety justification, prevented Plaintiffs from bringing their own blade guard to the marketplace. Plaintiffs allege that the implementation of the blade guard standard unnecessarily prevented SawStop and/or others from introducing products with competing, and superior, blade guard designs. FAC ¶ 124, A-101-102. In fact, stifling competition of blade guard designs was the precise purpose of the standard. FAC ¶ 105, A-97. Such an exclusion of a product from the marketplace, as a result of corrupted standard setting practices, resulted in reduced diversity and quality of products, which is a classic form of injury to competition. *See Radiant Burners*, 364 U.S. at 658-659.

The district court did not address Plaintiffs' allegations of an injury to competition resulting from the Defendants' insistence of a single blade guard standard, at issue in Count III. The district court appeared to overlook Count III.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's order of dismissal.

November 10, 2014                            /s/ Jonathan W. Cuneo
                                              Jonathan W. Cuneo
                                              Joel Davidow
                                              Matthew E. Miller
                                              Cuneo Gilbert & LaDuca, LLP
                                              507 C Street, N.E.
                                              Washington, DC 20002
                                              (202) 789-3960
                                              (202) 789-1813 (facsimile)

                                              **Counsel for Plaintiffs-Appellants**

OF COUNSEL:

Jennifer E. Kelly
Cuneo Gilbert & LaDuca, LLP
507 C Street, N.E.
Washington, DC 20002
(202) 789-3960
(202) 789-1813 (facsimile)

Taylor Asen
Cuneo Gilbert & LaDuca, LLP
16 Court Street, Suite 1012
Brooklyn, NY 11241
(202) 789-3960
(202) 789-1813 (facsimile)

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 14-746       **Caption:** SD3, LLC, et al. v. Black & Decker (U.S.) Inc., et al.

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   ☑ this brief contains ____13,979____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   ☐ this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☑ this brief has been prepared in a proportionally spaced typeface using
   Microsoft Word 2010 _____ [*identify word processing program*] in
   Times New Roman 14-point font _____ [*identify font size and type style*]; **or**

   ☐ this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s) Jonathan W. Cuneo _____

Attorney for Plaintiffs-Appellants _____

Dated: November 10, 2014 _____

## CERTIFICATE OF SERVICE

I certify that on November 10, 2014 the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

Dated: November 10, 2014                     /s/ Jonathan W. Cuneo
                                        Jonathan W. Cuneo

61